**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**JOHNNY B. BROWN**                                                                    **PLAINTIFF**

**V.**                                                **CIVIL ACTION NO. 4:11CV182 HTW-LRA**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY**                                **DEFENDANT**

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Johnny B. Brown appeals the final decision denying his application for a period of disability and disability insurance benefits ("DIB"). The Commissioner requests an order pursuant to 42 U.S.C. § 405(g), affirming the final decision of the Administrative Law Judge. Having carefully considered the hearing transcript, the medical records in evidence, and all the applicable law, the undersigned recommends that the decision be affirmed.

**Procedural Background**

Plaintiff was born on July 23, 1957, and was 46 years old on his alleged onset date of April 15, 2004; he is classified as a younger individual under the regulations (ages 18-49). During the pendency of his application, he subsequently changed age category to an individual closely approaching advanced age (ages 50-54). His application, which was filed on October 28, 2009, was denied initially and on reconsideration. He timely appealed the denial and on February 4, 2011, Administrative Law Judge Charles W. Kunderer ("ALJ") rendered an unfavorable decision finding that Plaintiff was not disabled. Plaintiff alleges disability due to asthma, depression, low back pain, and a right rotator cuff tear.

After reviewing the evidence, the ALJ concluded that Brown was not disabled under the Social Security Act at any time from April 15, 2004, through March 31, 2009, the date he was last insured. At step one of the five-step sequential evaluation,[1] the ALJ found Plaintiff had not

---

[1]Under C.F.R. § 404.1520, the steps of the sequential evaluation are: (1) Is plaintiff engaged in substantial gainful activity? (2) Does plaintiff have a severe impairment? (3) Does plaintiff's impairment(s) (or combination thereof) meet or equal an impairment listed in 20 C.F.R. Part 404, Sub-part P, Appendix 1? (4) Can plaintiff return to prior relevant work? (5) Is

engaged in substantial gainful activity since his alleged onset date, April 15, 2004. At steps two and three, the ALJ found that although Plaintiff's status post rotator cuff injury/repair and back pain were severe, neither impairment alone or in combination, met or medically equaled any listing. The ALJ found Brown's asthma and depression were only slight abnormalities, having "such minimal impact on the individual that [they] would not be expected to interfere with his ability to work, irrespective of age, education, or work experience." *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). At step four, the ALJ found that Plaintiff has the residual functional capacity to perform a full range of light work activity. Relying on the Medical-Vocational Guidelines ("Grids") and vocational expert testimony at step five, the ALJ concluded that, through the date of last insured, given Plaintiff's age, education, work history, and residual functional capacity, he is not disabled and can perform work as a cleaner/janitor or food preparer.

## Standard of Review

Judicial review in social security appeals is limited to two basic inquiries: "(1) whether there is substantial evidence in the record to support the [ALJ's] decision; and (2) whether the decision comports with relevant legal standards." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991)). Evidence is substantial if it is "relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). This Court may not re-weigh the evidence, try the case *de novo*, or substitute its judgment for that of the ALJ, even if it finds evidence that preponderates against the ALJ's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

---

there any work in the national economy that plaintiff can perform? *See also McQueen v. Apfel*, 168 F.3d 152,154 (5th Cir. 1999).

**Discussion**

Brown raises two primary arguments on appeal: (1) the ALJ's residual functional capacity finding is not supported by substantial evidence; and (2) the ALJ improperly relied on the Grids and vocational expert testimony. The undersigned rejects these arguments for the reasons that follow.

    **1.    Substantial evidence supports the ALJ's finding that Plaintiff has the residual functional capacity to perform light work.**

Plaintiff argues the ALJ erred in finding that he had the residual functional capacity to perform a full range of light work. Despite injuring his rotator cuff more than four years prior to his alleged onset date, he claims that he is unable to perform even light exertional activities. He also claims that asthma affects his ability to walk short distances, and arthritis pain radiates from his back to his shoulder and legs. He also suffers from depression and claims that antidepressants affect his memory and ability to concentrate.

The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to produce some of his alleged symptoms, his testimony regarding the intensity, persistence, and limiting effects were not fully credible. Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ has the discretion to make a finding on the credibility of the statements, and the determination is entitled to considerable deference. *Foster v. Astrue*, 277 F. App'x. 462 (5th Cir. 2008); *see also Gonzales v. Astrue*, 231 F.App'x 322 (5th Cir. 2007) (adverse credibility determination made by an ALJ was supported by inconsistencies between claimant's testimony and documentary evidence).

Prior to his alleged onset date, Brown worked for 26 years as a day laborer for the City of Meridian, Mississippi, performing various tasks such as lifting pipes, garbage, and bags of cement. In August 2000, some four years prior to his alleged onset date, Plaintiff tore the rotator cuff in his right shoulder while trimming trees on the job. Dr. David Pomierski, an orthopedic surgeon, performed corrective surgery in September 2000. By December 2000, Plaintiff was

3

returned to light duty work with restrictions to lift no greater than five to ten pounds and no repetitive overhead arm placement. Two years later, he returned to Dr. Pomierski with complaints of recurrent pain. Although there was no obvious re-injury, a "small, residual insubstance tear of the supraspinatus tendon" was repaired in a mini-open procedure in March 2002, and within three months, medical records indicated that Plaintiff was doing well. No rotator cuff weakness was detected and he was cleared to return to light duty work, with restrictions not to lift or carry over 10 pounds or lift over shoulder level. Ten months later, in January 2003, Plaintiff returned to Dr. Pomierski again with complaints of right shoulder pain. The doctor noted "some incompetency of the rotator cuff integrity" and discussed the "option for mini-open rotator cuff exploration." According to Dr. Pomierski, Plaintiff responded "that no matter what was attempted he knew that he would never be able to work again." Dr. Pomierski suspected that there were "secondary gain factors operational" and advised Plaintiff to seek a second opinion.[2]

Records indicate that Plaintiff sought a second opinion the following month from Capital Orthopaedics, but the examining physician, Dr. Temple, reportedly had a "very difficult time" during his examination: Plaintiff's answers were unclear; his symptoms were not specific; and, no active range of motion could be determined due to self-limitation. Ultimately, Dr. Temple determined that no further surgical intervention was warranted, but he recommended that Plaintiff undergo a functional capacity evaluation to "further clarify the situation."[3] Seven months later (in July 2003), Plaintiff returned to

---

[2]ECF No. 5-7, pp. 14-32.

[3]ECF No. 5-2, p. 12. In a previous order, this Court noted that Dr. Temple's records were not included in the certified administrative record submitted on appeal. The Commissioner has advised that were not requested at the agency level because Dr. Temple's only examination predates Plaintiff's alleged onset date by more than a year. ECF No. 13, p.1. See C.F.R. 404.1512(d). Although the administrative record includes Dr. Pomierski's records dating back to August 2000, and the ALJ appears to characterize Dr. Temple's records as direct evidence at times, the Court accepts the Commissioner's contention that the ALJ is merely referencing Dr. Temple's findings as summarized by Dr. Geissler in his report. Plaintiff does not dispute this interpretation nor has she ever requested that the record be supplemented with Dr. Temple's

4

Dr. Pomierski with continued complaints of shoulder pain, and though he claimed that he had tried several times to get an appointment, Dr. Pomierski noted that his account conflicted with office records. He also observed that Plaintiff was wearing a sling, but appeared to have good free motion passively with no crepitation appreciated.[4]

The only orthopedic examination of record to post-date Plaintiff's alleged onset date was conducted by orthopedic surgeon, Dr. William B. Geissler, in May 2004. The purpose of the examination was to obtain an Independent Medical Evaluation as to whether Plaintiff should undergo another shoulder surgery. In a detailed report of his examination, Dr. Geissler summarizes the claimant's medical history, including the evaluations and clinical notes of Dr. Pomierski and Dr. Temple. Dr. Geissler reports that when he walked into the examination room, Plaintiff was sitting on the examination table, but he soon began "grimacing, moaning, and moving side to side on the exam table, describing how much pain he was in." Dr. Geissler could not track the scapula of the shoulder because Plaintiff "would not raise his arm," and "guarded quite heavily," but his physical examination indicated "no atrophy of the deltoid, supraspinatus, or infraspinatus." He also observed a "well-healed and appropriately placed anterior incision over the deltoid." Passive external rotation was neutral and internal rotation was 10 degrees, but Plaintiff would not allow Dr. Geissler to passively flex the shoulder past 45 degrees "secondary to muscle guarding." When asked to perform movements requiring no shoulder function at all, Plaintiff claimed that he could not do it. Dr. Geissler found Plaintiff's "physical examination was anatomically very inconsistent," explaining that:

> It makes no sense anatomically, no matter how large a tear of the cuff, from a fall nearly four years ago, that with the arm resting at the side, he could not flex and extend the fingers or elbow. This requires no involvement of the rotator cuff musculature of the shoulder.

---

records.

[4]ECF No. 5-7, pp. 19-20.

> I do not understand how a patient could be sitting there moaning, groaning and grimacing from side to side from an injury nearly four years old. I feel there is a large amount of symptom magnification and that was the reason I observed Mr. Brown as he left my clinic to see if his symptoms were unchanged.[5]

As Plaintiff left the clinic, Dr. Geissler noted that Plaintiff continued to moan and limp, but upon entering the parking lot, he began "walking with a normal gait and actually skipped or jumped up over the curb with a hop." He was also no longer limping and although his companion opened the car door for him, Dr. Geissler observed him take his arm and use his hand to close the car door.[6]

Dr. Geissler ultimately opined that Plaintiff reached maximum medical improvement in February 2003, and had a 10 percent permanent partial impairment, but he was careful to note that this was "not an objective rating, because of the amount of symptom magnification." He explained that:

> Radiographs showed no migration of the humeral head. Patients with large tears of the rotator cuff that have not healed or those with chronic massive tears, eventually in most instances show some type of proximal migration of the humeral head. In Mr. Brown's case, the plain radiographs did not show any elevation. This was noted by both myself and other physicians.[7]

Accordingly, Dr. Geissler concurred with previous physicians that "any benefits to further surgical intervention [were] outweighed by the surgical risks." He also agreed with their suggestions that Plaintiff undergo a functional capacity evaluation.[8]

The physical work performance evaluation ordered by Dr. Geissler was performed by Professional Therapy Services, Inc., in August 2004. The physical therapist who completed the summary reported that, given the extent of self-limiting behavior, however, this overall level of performance is influenced by what the client was willing to do, rather

---

[5] ECF No. 5-7, p. 36.

[6] ECF No. 5-7, pp. 33-37.

[7] ECF No. 5-7, p. 37.

[8] ECF No. 5-7, p. 36.

than his maximum safe ability. Plaintiff reportedly "demonstrated self-limiting participation by stopping on five out of the 12 tasks (42 percent)," and participating in only seven tasks. Examiners explained that self-limiting participation represents "what the client was willing to do rather than a safe maximum physical effort." Despite the self-limiting behavior, the evaluation indicated that he was capable of performing light physical work activity.[9] He was "cleared to lift floor to waist 12 pounds, waist to eye level 12 pounds occasionally. He was able to two-hand carry 17 pounds occasionally. He was able to push and pull 20 pounds occasionally. He was able to sit frequently. He was restricted from overhead work." The ALJ assigned significant weight to this performance evaluation, and expressly noted that upon reviewing it, Dr. Geissler reaffirmed his previous assessment that Plaintiff has a "10 percent permanent partial impairment to the upper extremity."[10]

The only medical provider to opine that Plaintiff's functional limitations would prevent him from returning to work was Dr. Linda Pollock, who treated Plaintiff from July 2003-September 2005. Although a treating physician's opinion should be afforded considerable weight in determining disability, "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 456.

Plaintiff requested a statement of disability from Dr. Pollock in 2003, and she obliged. Dr. Pollock opined that Brown was permanently disabled and would never be able to resume gainful employment because of his "severe depression, low back pain, and

---

[9]ECF No. 5-7, pp. 38-41.

[10]ECF No. 5-7, p. 42.

chronic right shoulder pain."[11]  Dr. Pollock does not clarify on what "medically acceptable clinical and laboratory diagnostic techniques" she bases these assessments. Her treatment records show mostly that Plaintiff complained of pain and was treated with medications; they do not include any objective medical findings supporting her opinion. The doctor's x-rays of the lumbar spine taken in October 2004 were described as markedly under-penetrated and inadequate for interpretation, and x-rays of his right shoulder showed no gross abnormalities.  A doppler ultrasound of his lower extremities performed that same year revealed "normal flow and good compressibility of all of the veins."[12]  Dr. Pollock never assessed Plaintiff's actual functional abilities.  She merely offered a conclusory opinion without supporting documentation that he was disabled. Plaintiff must "produce more than an unsubstantiated, contradictory and totally conclusory statement to carry [his] burden of establishing a medically demonstrable disability on the relevant date." *Kirkland v. Weinberger*, 480 F.2d 46, 49 (5th Cir. 1973).

There was also insufficient evidence that Plaintiff's reported chest pain and dyspnea were cardiac in nature.   Upon examining Plaintiff in January 2007, Dr. E. Michael Purvis noted that Plaintiff complained that he hurts all over and that he complained of "numerous somatic aches and pains involving virtually all of his muscles and joints at one time or other."  After conducting several  objective medical tests, Dr. Purvis opined that Plaintiff's chest pains were "musculoskeletal in nature, probably related to his shoulder injury."  His stress test and left ventricular function were normal, and there was no evidence of significant cardiac ischemia.  Echocardiogram results were also normal, ruling out the possibility that his chronic dyspnea was "related to any cardiac dysfunction."  Dr. Purvis suspected that his dyspnea was caused by his "tobacco abuse

---

[11]ECF No. 5-7, pp. 57, 59, 68.

[12]ECF No. 5-7, pp. 75, 79.

8

and deconditioning," but noted that Plaintiff did not "seem willing to make an effort" to stop smoking.[13]

Given the facts as stated, there is substantial evidence to support the ALJ's residual functional capacity finding.

Substantial evidence also supports the ALJ's finding that Plaintiff's depression was not severe. Records confirm that Plaintiff was treated at Weems Mental Health Center in 2003 and 2004, and then again from March 2007 to September 2009; he was diagnosed with depressive disorder and alcohol abuse (in full sustained remission). Treatment records reflect that two of his four children had passed away: one was hit by a drunk driver in the late 80's, and the other was shot and killed in February 2005. On more than one occasion, he expressed sadness over their deaths. The records do not substantiate Plaintiff's assertion that psychiatric or physiological stressors would impair his ability to perform light work. Aside from physical pain, the records show Plaintiff primarily complained of financial and other life stressors--- he even commented that all his problems would be gone when he receives disability. Records indicate that his stress and anxiety seemed to be "mostly revolving around [his] disability claim." They also reflect that Plaintiff had poor compliance with medication, despite his frequent reporting that the medication helped.[14] Based on the records at Weems, the ALJ reasonably concluded that Plaintiff's depression constituted only a slight abnormality, as Plaintiff had no evidence of restrictions in activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace, and no episodes of decompensation.

The sole responsibility for determining a claimant's residual functional capacity rests with the ALJ, and the substantial evidence of record in this case supports the ALJ's finding that Plaintiff has the residual functional capacity to perform light work. 20 C.F.R. § 404.1546(c) (2010).

---

[13]ECF No. 5-7, pp. 96-98.

[14]ECF No. 5-7, pp. 43-46; 5-7, pp. 100-116.

## 2. Substantial evidence supports the ALJ's application of Grid Rules 202.10 and 202.17.

Given Plaintiff's residual functional capacity, age, education, and work experience, the ALJ determined that through the date of last insured, Grid Rules 202.10 and 202.17 direct a finding of non-disability. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2. This finding is supported by the vocational expert's testimony that a hypothetical individual with the Plaintiff's same age, education, and work experience could perform light work as a janitor/cleaner or food preparer. Plaintiff maintains that the ALJ should have applied Grid Rule 202.9, which directs that a person with his residual functional capacity is disabled, if he is closely approaching advanced age, has either unskilled or no previous work experience, and is illiterate or unable to communicate in English. 20 C.F.R. Pt. 404 Supt. P., App. 2.

Neither party disputes that as of the date of last insured, Brown's age classification had changed from a "younger individual" to that of a "person closely approaching advanced age" as defined by the regulations. 20 C.F.R. § § 404.1563(d). But Brown claims that the evidence also demonstrates that he was illiterate. He points to his hearing testimony that he was placed in special education classes and has only an eighth grade education. He also suggests that a casual reading of the transcript demonstrates his difficulties with comprehension and communication which, when compounded with his depression, would impair his ability to follow verbal and written instructions.

An ALJ is entitled to rely on a claimant's testimony regarding his education, and contrary to the arguments raised on appeal, Plaintiff testified that he was *not* illiterate at the administrative hearing.[15] *See Perez v. Barnhart*, 415 F.3d 457, 463 (5th Cir. 2005). Although the record confirms that he testified that he received only an eighth grade education, Brown initially indicated in his disability report that he has a tenth grade education and attended Northeast High School in Lauderdale, Mississippi, from September 1972 to May 1975.[16] Regardless, the ALJ determined

---

[15]ECF No. 5-2, p. 40.

[16]ECF No. 5-6, p. 15.

that Plaintiff has a limited education. The regulations define "limited education" as education attained from the seventh through the eleventh grades. In contrast, the regulations define a person with "little or no formal schooling" who has no ability to read or write as illiterate. 20 C.F.R. § 416.964(b)(1). Here, while Plaintiff has consistently maintained that he received "special help with reading and writing" in school, he affirmatively indicated on the disability report that he could read, write, and understand English.[17] Given the lack of evidence and Plaintiff's own testimony denying illiteracy, the undersigned rejects this allegation of error.     Finally, Plaintiff fails to present sufficient evidence that his depression would impair his ability to perform light work activity or to follow verbal or written instructions. Despite his subjective complaints that antidepressants affect his memory and ability to concentrate, therapy records consistently reflect that at each visit, Plaintiff's memory and concentration were "grossly intact," his insight was fair, and his thought processes were coherent.[18]

Having carefully considered the pleadings, the medical records, and the applicable law, the undersigned concludes that the findings of the ALJ were supported by substantial evidence and that the decision denying disability comports with relevant legal standards.

## Conclusion

For these reasons, it is the opinion of the undersigned United States Magistrate Judge that Plaintiff's Motion to Remand should be denied; that Defendant's Motion to Affirm the Commissioner's Decision be granted; that Plaintiff's appeal be dismissed with prejudice; and, that Final Judgment in favor of the Commissioner be entered.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

---

[17]ECF No. 5-2, p. 27; ECF No. 5-6, p. 5, 15.

[18]ECF No. 5-7, pp. 100-116.

11

accepted by the district court. 28 U.S.C. § 636, Fed. R. Civ. P. 72(b) (as amended, effective December 1, 2009).

This the 12th day of February 2013.

/s/ Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE